IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
|  | : |  |
| **DARLENE COLE** |  |  |
| 1714 Unity Ct. | : |  |
| Toledo, Ohio 43614 |  |  |
|  | : |  |
| **JOSEF C. DUBILZIG** |  |  |
| 238 Windsor Dr. | : |  |
| Rossford, Ohio 43460 |  |  |
|  | : |  |
| **BARRY HOWARD SR.** |  |  |
| 2244 Maple Wood | : |  |
| Toledo, Ohio 43620 |  |  |
|  | : |  |
| **VICENTE JUAREZ** |  |  |
| 1304 Superior St. | : |  |
| Genoa, Ohio 43430 |  |  |
|  | : |  |
| **GEORGIA TISDALE** |  | Case No.: |
| 4841 Flanders Rd. | : |  |
| Toledo, Ohio 43623 |  | Judge |
|  | : |  |
| Plaintiffs, |  | **COMPLAINT** |
|  | : |  |
| v. |  | **(Jury Demand Endorsed Hereon)** |
|  | : |  |
| **FCA US LLC** |  |  |
| c/o Chris Pardi, General Counsel | : |  |
| 1000 Chrysler Drive |  |  |
| Auburn Hills, MI 48326 | : |  |
| Statutory agent: |  |  |
| CT Corporation System | : |  |
| 4400 Easton Commons Way, |  |  |
| Suite 125 | : |  |
| Columbus, OH 43219 |  |  |
|  | : |  |
| and |  |  |
|  | : |  |
|  |  |  |
| **INTERNATIONAL UNION, UNITED** | : |  |
| **AUTOMOBILE, AEROSPACE AND** |  |  |
| **AGRICULTURAL IMPLEMENT** | : |  |
| **WORKERS OF AMERICA** |  |  |

1

c/o Dennis Williams, President                    :
Solidarity House
8000 E. Jefferson Ave.                            :
Detroit, MI 48214
                                                 :
and
                                                 :


**UNITED AUTOMOBILE, AEROSPACE**   :
**AND AGRICULTURAL IMPLEMENT**
**WORKERS OF AMERICA, REGION 2B**   :
c/o Rich Rankin, Director
1691 Woodlands Dr.                               :
Maumee, Ohio 43232
                                                 :
Defendants.
                                                 :

                                                 :

                                                 :

                                                 :

                                                 :

                                                 :

                                                 :


## INTRODUCTION

1.      Now come Plaintiffs, all individuals who were induced to "retire" from Chrysler

to work at nominally independent suppliers and fired when Chrysler unilaterally abandoned the

arrangement, and bring this action against FCA US LLC and their labor union, the United

Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), for

breach of a collective bargaining agreement pursuant to the Labor Management Relations Act,

29 U.S.C. § 185, ("LMRA") and against their labor union, the UAW International Union, for

2

violations of its duty of fair representation by accepting bribes to bargain away Plaintiffs' jobs, pursuant to Section 301 of the LMRA (codified at 29 U.S.C. § 185).   In addition, Plaintiffs bring allegations of discrimination based upon age under Ohio law.

## PARTIES

1.      Plaintiff Darlene Cole is an individual residing in Toledo, Lucas County, Ohio. Darlene Cole is a citizen and resident of Ohio.

2.      Plaintiff Josef C. Dubilzig is an individual residing in Rossford, Wood County, Ohio.  Josef C. Dubilzig is a citizen and resident of Ohio.

3.      Plaintiff Barry Howard Sr. is an individual residing in Toledo, Lucas County, Ohio.  Barry Howard Sr. is a citizen and resident of Ohio

4.      Plaintiff Vicente Juarez is an individual residing in Genoa, Ottowa County, Ohio. Vicente Juarez is a citizen and resident of Ohio.

5.      Plaintiff Georgia Tisdale is an individual residing in Toledo, Lucas County, Ohio. Georgia Tisdale is a citizen and resident of Ohio.

6.      Defendant FCA US LLC is a foreign limited liability company organized under the laws of the State of Delaware.

7.      Defendant International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW International Union") is one of the largest and most diverse labor organizations in the United States, representing over 400,000 active workers and 580,000 retirees.

8.      Defendant United Automobile, Aerospace and Agricultural Implement Workers of America, Region 2B ("UAW Region 2B") is a labor organization and is a constituent part of

the UAW International Union responsible for overseeing and supporting UAW locals in Ohio and Indiana.

9.      Defendants UAW International Union and UAW Region 2B will be referenced as the UAW Defendants.

## JURISDICTION AND VENUE

10.     This action arises from Plaintiffs' employment at, and subsequent termination from, a substantial automobile assembly plant in Toledo, Ohio (the "Jeep Complex") operated by Defendant FCA US LLC.  Although employment numbers varied over time, FCA US LLC employs, and the UAW Defendants represent, thousands of workers at the Jeep Complex.

11.     This Court possesses personal jurisdiction over Defendant FCA US LLC because this action arises from its regular transaction of business in this state through the operation of the Jeep Complex.

12.     As set forth below, the UAW Defendants represent workers at the Jeep Complex. This Court possesses jurisdiction over each of the UAW Defendants pursuant to the LMRA at 29 U.S.C. § 185(c)(2).

13.     This action arises from a series of employment and collective bargaining relationships centered at the Jeep Complex in Toledo, Lucas County, Ohio.  Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1) as a substantial part of the events or omissions giving rise to the claim occurred here.

14.     This Court has subject matter jurisdiction over Plaintiffs' LMRA claims pursuant to 28 U.S.C. § 1331 because they arise under the laws of the United States.  *See*: 29 U.S.C. § 185.  This Court has supplemental jurisdiction with respect to Plaintiffs' state-law discrimination claims pursuant to 28 U.S.C. § 1367 as they arise from the same case and controversy.

## COMMON FACTUAL ALLEGATIONS

15.     Under various corporate entities, Jeep vehicles and related components have been manufactured at the Jeep Complex, a substantial facility in northern Toledo, since the 1940's.

16.     Over the years, a variety of different Jeep vehicles and components have been manufactured at the Jeep Complex under the auspices of a variety of different corporate structures and contractor/supplier arrangements.

17.     Since the late 1980's, the Jeep brand has been part of the Chrysler family of brands, one of the "Big Three" American automobile manufacturers.  Over the years, Chrysler has undergone a series of mergers, partnerships, corporate structures and a Chapter 11 Bankruptcy reorganization in 2008-2009.[1]

18.     In 2009, Chrysler emerged from bankruptcy protection with the UAW pension fund, Fiat S.p.A. (an Italian automaker) and the United States and Canadian government as principal owners.  Since 2009, Fiat has gradually acquired the other parties' shares and the Chrysler family of brands is now a wholly owned subsidiary of Fiat: Defendant FCA[2] US LLC.

19.     The UAW, one of the largest labor organizations in the United States, has historically represented hourly Chrysler workers, along with hourly workers in the automobile industry in the United States.

20.     The UAW is a hierarchical organization governed by the Constitution of the UAW International Union.

21.     UAW Members form Local Unions, which bargain with one or a handful of employers or worksites.  UAW locals are grouped into approximately nine regions, which are

---

[1] Unless otherwise specified, "Chrysler" as used herein shall mean the sequence of corporations that manufactured and marketed Chrysler automobiles, now FCA US LLC.
[2] "FCA" is an abbreviation for "Fiat Chrysler Automotive."

intended to oversee and support local organizing and bargaining activities.  In turn, UAW International Union oversees and supports all UAW Regions and Locals.

22.     Hourly workers at the Jeep complex are, and have historically been, represented by United Automobile, Aerospace and Agricultural Implement Workers of America, Local 12 ("UAW Local 12").

23.     UAW Local 12 represents multiple UAW bargaining units in the Toledo, Ohio area.  Relevant to this case, UAW Local 12 represents hourly workers at the paint shop, which (among other things) painted new Jeep Wrangler vehicles assembled at the nearby Toledo South Assembly Plant.  As set forth below, the "Wrangler Paint Shop" was operated by a number of corporate entities throughout the relevant time period.

24.     In the U.S. automotive industry, collective bargaining agreements between the UAW and the "Big Three" manufacturers (General Motors, Ford and Chrysler) are negotiated in two parts.

25.     Approximately every four years, the UAW International Union bargains for a series of master agreements with each of the Big Three automakers.

26.     With respect to Chrysler, the UAW International Union bargains for two separate master agreements: one covering Engineering, Office and Clerical workers and one covering Production Maintenance and Parts workers.  These agreements cover issues such as changes in wage rates, seniority, grievance processes, attendance polices, hours of work, procedures for transferring from one plant to another, etc.  Of relevance to this case are:

      a.  The 2015 Production Maintenance and Parts agreement, attached hereto as Exhibit 1 (except for minor modifications in 2007 and 2011, this plan was in effect for the entire time period);

     b.   The 2011 Pension Agreement, attached hereto as Exhibit 2;

     c.   The 2009 Jeep Corporation Retirement Income Plan, attached hereto as Exhibit 3 (except for minor modifications in 2009, this plan was in effect during the entire until approximately 2011).

27.     The UAW International Union and Chrysler have also, from time to time, bargained for various letters, memoranda and supplemental agreements.  In addition, the UAW International Union and Chrysler have bargained for a separate pension agreement covering all Chrysler employees represented by the UAW.

28.     The master agreements described in the preceding paragraphs contemplate additional agreements between UAW Local Unions and Chrysler management concerning specific bargaining units, including units at specific Chrysler facilities.  Some issues, such as the specific order of applicable seniority lists, are explicitly left to local negotiation.  In addition,  the UAW Local Unions are permitted limited discretion to bargain with local Chrysler management about particular issues governing a plant or bargaining unit, provided these agreements are consistent with the master agreements bargained for between Chrysler and the UAW International Union.

**Chrysler induces Plaintiffs to "retire" to help the
company launch a new product at the Jeep Complex**

29.     In approximately 2004-2006, each Plaintiff was a long-serving hourly Chrysler employee and UAW member who had accumulated significant seniority within his or her respective bargaining unit.

30.     Each Plaintiff was a Chrysler employee in the 2004-2006 timeframe.  Some had been working at the Jeep Complex before Chrysler took over management of the plant from American Motors in the 1980's.

31.     In 1998, Chrysler, then an independent company, merged with the German automaker Daimler-Benz AG and became a division of DaimlerChrysler.

32.     In the early 2000's, Chrysler constructed a new assembly line in the Jeep Complex to manufacture the 2007 Jeep Wrangler, a significant redesign of the vehicle that began its life as a general-purpose military vehicle prior to the Second World War.

33.     Unlike traditional automobile assembly plants, the new assembly line tested a new "collaborative" structure in which third-party suppliers would be co-located and would perform portions of the manufacturing and assembly process traditionally undertaken by Chrysler hourly employees (the "Toledo Supplier Park").

34.     In order to "launch" the new assembly line, Chrysler and its suppliers needed a cadre of experienced autoworkers to ensure that the smooth operations of the new plant.

35.     However, Chrysler and its suppliers had difficulty recruiting experienced workers willing to leave established plants at which they had acquired seniority for the Toledo Supplier Park, due to relative uncertainty surrounding both the new product and the new management structure.

36.     Chrysler and the UAW actively recruited senior UAW members already employed by Chrysler at the Jeep Complex in order to staff the Toledo Supplier Park by encouraging them to retire from Chrysler, begin collecting their pensions and begin working at the Toledo Supplier Park through the nominally independent third-party suppliers.

37.     Each Plaintiff retired from Chrysler in or around 2006 and eventually went to work in the "Wrangler Paint Shop," a part of the Toledo Supplier Park that painted Jeep Wranglers as they came off the production line.

38.     Both Chrysler managers and UAW International Union executives represented to Plaintiffs that, if they retired from Chrysler and went to work at the Toledo Supplier Park they could continue to work indefinitely and that there was no "expiration date" to their employment. Chrysler managers and UAW International Union executives made similar representations to the leadership of UAW Local 12.

39.     Plaintiffs were in their late forties and early fifties in 2006 and intended to work for another decade or more.  Plaintiffs relied on the representations described in the previous paragraph that their long-term employment was secure when they decided to retire from Chrysler earlier than they otherwise planned.

40.     As originally planned, Hayden Prism was the supplier identified to operate the paint shop for the new Wrangler line ("the Wrangler Paint Shop").

41.     However, Hayden pulled out of the project at the last minute due to bankruptcy in 2006.  At that time, while the plant was still preparing to start production, Chrysler took direct control of the Wrangler Paint Shop.

42.     Following Hayden's bankruptcy, Chrysler engaged Spherion, a national staffing agency, to operate, mostly off site, certain payroll and human resources functions for hourly employees in the Wrangler Paint Shop.  However, Chrysler employed all managers in the shop. Chrysler made all substantive decisions about production and staffing.

43.     Upon information and belief, during 2006 and 2007, Chrysler worked on finding a replacement for Hayden.  In 2007, Magna Styer agreed to take over the Wrangler Paint Shop.

44.     When the so-called Toledo Supplier Park began production: the KUKA group, a German company, was responsible for building the bodies for the Wrangler; Hyundai owned Mobis-Ohio Module Manufacturing Company (OMMC) assembled the vehicle's chassis; and

Magna Styer ran the paint shop.  All of these entities and respective processes were conducted at the direction of, and coordinated by, Chrysler at all relevant time periods.

45.     From 2008, hourly workers in the Wrangler Paint Shop were covered by a collective bargaining agreement between the UAW International Union, UAW Local 12 and a Magna Styer, attached hereto as Exhibit 4.

46.     Between 2006 and 2011, various other corporate entities undertook Magna Styer's duties as successors.  In approximate chronological order, these nominal employers consisted of: Hayden, Durr; Spherion; Magna Styer; and Gonzalez.

47.     At all times however, Chrysler operated the Wrangler Paint Shop as part of larger assembly line for the company's Jeep Wrangler vehicles.  This assembly line, in turn, is and was a part of a larger Jeep Complex, owned and operated by Chrysler.  That is, the Wrangler Paint Shop was at all times an integrated part of a Chrysler plant, was located on Chrysler property and exclusively worked on Chrysler vehicles.

48.     The central arrangement in the Toledo Supplier Park, having suppliers perform central assembly functions on Chrysler's premises, is specifically prohibited and/or severely curtailed by the various master agreements in place between the UAW and Chrysler.  For example, the UAW is appointed the exclusive bargaining representative for hourly workers in Chrysler plants and independent contractors are broadly prohibited from displacing UAW member to undertake traditional assembly work.

49.     In order to operate the Toledo Supplier Park, including the Wrangler Paint Shop, with employees of suppliers and other entities, Chrysler needed the agreement and cooperation of the UAW International and Local unions.

50.     Chrysler management and leadership of the UAW International Union repeatedly assured both the leadership of UAW Local 12 and individual employees such as Plaintiffs, that they would be "taken care of" if they agreed to retire from Chrysler and work in the Wrangler Paint Shop, notwithstanding the unprecedented management structure and that any future significant changes to Plaintiffs' employment conditions would only occur after additional collective bargaining between the UAW and Chrysler.

51.     Traditionally, any bargaining concerning the status of UAW members working in a Chrysler plant would involve the UAW International Union, the UAW Local Union (in this case Local 12) and Chrysler management.  In 2006, neither Chrysler nor the UAW International Union indicated to Plaintiffs or UAW Local 12 leadership that they intended to deviate from this longstanding pattern.

52.     During this period, the UAW International Union and UAW Local 12 continued to represent Plaintiffs, as well as all hourly employees at Toledo Supplier Park generally, and the Wrangler Paint Shop in particular.

## Chrysler takes direct control of Wrangler Paint Shop and Terminates Plaintiffs

53.     Between the opening of the Toledo Supplier Park and early 2011, Chrysler had undergone a series of significant corporate transactions, including the end of its partnership with Daimler-Benz, the Chapter 11 Bankruptcy reorganization and purchase by Fiat.

54.      By early 2011, the business relationship concerning the Wrangler Paint Shop between Magna Styer and Chrysler had deteriorated.  Generally, Magna Styer no longer desired to operate the Wrangler Paint Shop and Chrysler desired to exercise more direct control over the management of the plant.

55.     Effective March 1, 2011, and pursuant to an agreement with Magna Styer, Chrysler (then "Chrysler LLC," a division of Fiat) took over direct management of the Wrangler Paint Shop.

56.     Pursuant to a letter agreement (attached hereto as Exhibit 5) between Chrysler Human Resources Director P.G. Shagena and UAW Region 2B Director Kenneth Lortz, Chrysler "carried over" the conditions of Exhibit 4 after it took over management of the Wrangler Paint Shop.

57.     Pursuant to Section 3.4 of Exhibit 4, the collective bargaining agreement between Chrysler and Magna Styer could be assigned to other successor entities.

58.     On behalf of UAW Region 2B, Lortz also agreed in Exhibit 3 to permit Chrysler to "assign" represented employees, including Plaintiffs, to "a third party to be managed by Chrysler."

59.     After March 2011, Chrysler exercised direct control of the Wrangler Paint Shop. Chrysler directly employed all managers in the shop.  Chrysler made all substantive decisions about production and staffing.

60.     However, Chrysler "assigned" Plaintiffs and other hourly workers at the Wrangler Paint Shop to the payroll of Gonzalez Contract Services, LLC ("Gonzalez").

61.     Between early 2011 and middle of 2012, with respect to the Wrangler Paint Shop, Gonzalez performed almost no management or business function besides serving as the nominal employer of the hourly workers inherited from Magna Styer, including Plaintiffs.

62.     Plaintiffs continued to work at a Chrysler facility, reporting exclusively to Chrysler management, making only Chrysler vehicles.  As outlined above, this arrangement was

contrary to various master agreements in place between the UAW and Chrysler, which limited or strictly curtailed the use of contract workers in Chrysler facilities.

63.    The UAW International Union agreed to permit the unconventional arrangement to continue, despite provisions in the applicable master agreements to the contrary.  During this period, UAW International Union leadership again repeatedly reassured Plaintiffs and the leadership of UAW Local 12 that the arrangement would have no adverse affect on the UAW members working in the Wrangler Paint Shop.

64.    At some point in late 2011 or early 2012, Chrysler and the UAW International Union decided to end the nominal supplier/contractor agreement that had prevailed in the Wrangler Paint Shop since it opened.  The reasons for and timing of this decision were obscure to both Plaintiffs and the leadership of UAW Local 12.  However, the primary goal of both Chrysler and the UAW International Union appeared to involve "insourcing" the Wrangler Paint Shop such that all employees would be traditional employees of Chrysler.

65.    This "insourcing" took the form of Chrysler purporting to "terminate" Gonzalez's contract to perform the nominal payroll and human resources functions with respect to the Wrangler Paint Shop.  As Chrysler expected and intended, this decision resulted directly in Gonzalez purporting to "lay off" all of the UAW employees in the Wrangler Paint Shop.

66.    Because of the unconventional nature of the of the arrangement governing the Wrangler Paint Shop from the beginning, Chrysler's decision to assert direct control of the plant created a need for collective bargaining concerning the status of UAW employees in the Wrangler Paint Shop.

67.     The bargaining between the UAW International Union and Chrysler in 2012 concerning the status of the employees of the Wrangler Paint Shop was marred by several procedural and substantive irregularities.

68.     First, a small number of UAW International Union executives, led by then Vice President of the UAW International Union's Chrysler Division General Holiefield, took over bargaining concerning the status of employees at Wrangler Paint Shop.  This group included, among others, Holiefield's aid James Hardy and UAW International Union Region 2B representative Jim Waingrow.

69.     At the time, Holiefield was the Vice President of the UAW International Union's Chrysler division.  As such, Holiefield was the top executive responsible for representing the UAW International Union in collective bargaining with Chrysler.  The other UAW International Union employees involved in bargaining over the status of the Wrangler Paint Shop were subordinate to Holiefield.

70.     In 2012, Holiefield was a long-serving and powerful executive of the UAW International Union who exerted extensive control over the national collective bargaining relationship between Chrysler and the UAW through his official authority, personal relationships and loyalty of his subordinates, many of whom Holiefield hired.

71.     Holiefield and his team from the UAW International Union systematically locked the employees of Wrangler Paint Shop and the leadership of UAW Local Union 12 out of the bargaining with Chrysler over the status of the Union's membership in the Wrangler Paint Shop.

72.     Holiefield's and UAW International Union's decision to exclude UAW Local Union 12 violates, among other provisions, Article 19, Section 3 of the UAW International Union's Constitution which provides:

> No Local Union Officer, International Officer or International Representative shall have the authority to negotiate the terms of a contract or any supplement thereof with any employer without first obtaining the approval of the Local Union. ***

Neither Holiefield nor the UAW International Union obtained approval form UAW Local 12 to undertake negotiations with Chrysler on behalf of workers in the Wrangler Paint Shop.

73.    Moreover, UAW Local Union 12's exclusion from bargaining with Chrysler is contrary to a long and well-established practice that the UAW Local and International Unions both participate in similar bargaining.

74.    Second, Holiefield and his team from the UAW International Union accepted, apparently without objection or dispute, Chrysler's position that the UAW members working in the Wrangler Paint Shop in late 2012 were solely employed by Gonzalez, had no particular relationship to Chrysler or the applicable master agreements and were functionally equivalent to new hires from the street.

75.    Holiefield and his team inexplicably accepted Chrysler's position on this point, despite:

a.    a long course of dealing between Chrysler and the UAW International Union concerning the status of its membership working in the Wrangler Paint Shop;

b.    Chrysler's assumption of an assignment of Magna Styer's role under the local collective bargaining agreement pursuant to Section 3.4 of Exhibit 4;

c.    the UAW International Union's repeated waivers of provisions of the applicable master agreements, which limited or strictly curtailed the used of contract workers in Chrysler facilities, allegedly in exchange for assurances from Chrysler that these individuals would be treated as Chrysler employees;

d.  Plaintiffs' treatment, like all of the employees in the Wrangler Paint Shop, as Chrysler employees, with mirror-image wages and benefits, including a Chrysler employee number that remained consistent throughout the relevant time period until the present;  and

e.  the repeated assurances given by the UAW International Union to Plaintiffs and UAW Local 12 that the status of these employees would be subject to bargaining between the UAW International Union, UAW Local 12 and Chrysler.

76.  Third, both Chrysler and the UAW International Union were inexplicably insistent on firing Plaintiffs, who had "retired" from Chrysler in 2006 and transferred to the Wrangler Paint Shop in order to offer the experience and expertise necessary to launch the production line.

77.  UAW International Union officials from Holiefield's team who were in communication with Plaintiffs or the leadership of UAW Local 12, including James Hardy and Jim Waingrow, offered shifting and illogical explanations for the decision to terminate Plaintiffs, along with all other employees who had "retired" from Chrysler in 2006 and transferred to the Wrangler Paint Shop.

78.  At various times, the UAW International Union and Chrysler management explained the need to terminate Plaintiffs by indicating that the applicable master agreements prohibited individuals who had "retired" from Chrysler and begun collecting a pension from returning to work for the company.

79.  Indeed, Chrysler spokeswomen Jodi Tinson offered this explanation in a November 29, 2012 article in the Toledo Blade: "By virtue of their retirement, they cannot return to employment with the company."

16

80.     Ms. Tinson's public pronouncements on this topic were consistent with the position communicated by both Chrysler and the UAW International Union during most discussions with Plaintiffs and the UAW Local 12 leadership during 2011 and 2012.

81.     However, the plain language of the master pension agreements explicitly permits UAW retirees to return to work for the company and provides an extensive framework for how such a situation would be handled:

>  a.  With respect to the 2011 Pension Agreement in place at the time that Chrysler took direct control of the Wrangler Paint Shop (Exhibit 2), see, *inter alia:* Section 1(C); Section 5;  Section 7(D); Section 11(Q); and Letter Agreement dated October 14, 1996.
>
>  b.  With respect to the Jeep Corporation-UAW Retirement Income Plan in place at the time that Plaintiffs "retired" from Chrysler and began collecting pensions (Exhibit 3), see, *inter alia:* Article I, Section 10; Article IV, Section V.

82.     Indeed, no local or master agreement in effect between the UAW International Union, UAW Local 12 and Chrysler prohibited Plaintiffs from continuing to work in the Wrangler Paint Shop after Chrysler ended the nominal supplier/contractor arrangement in place with Gonzalez, as was represented to Plaintiffs by both the UAW Defendants and Chrysler.

83.     As set forth above, the applicable master agreements provide a framework for just such an instance.

84.     Individual Plaintiffs, as well as the leadership of UAW Local 12, repeatedly brought the plain language of the applicable pension agreements to the attention of the officials at the UAW International Union who had unilaterally assumed authority for negotiations with Chrysler, including James Hardy and Jim Waingrow, and excluded UAW Local 12 officials from

participating.  In response, the officials of the UAW International Union offered conflicting and contradictory explanations for why the applicable master agreements required Plaintiffs' termination.  Eventually, the UAW International Union stopped responding to the inquiries.

85.     At one point, UAW Local 12 leaders arranged a single meeting between themselves, a group of Plaintiffs, the UAW International Union officials and Chrysler human resources executive Lisa Rhinehart Klosh.  At that meeting, Plaintiffs, including Plaintiff Wawzyniak, and UAW Local 12 leaders presented the plain language of the applicable bargaining agreements permitting Plaintiffs to continue to work in the Wrangler Paint Shop.

86.     At that meeting, Klosh seemed receptive to the presentation by Plaintiffs and the leadership of UAW Local 12 and indicated that Plaintiffs should continue to be employed according to the terms of the applicable master agreements.

87.     Shortly after this meeting, UAW International Union official Tim Bressler told members of the leadership of UAW Local 12 that Holiefield specifically desired that Chrysler's takeover of the Wrangler Paint Shop proceed as an "insourcing" of new employees and that this form of transaction required that Plaintiffs be terminated.  Bressler made it clear that Holiefield believed that this path was the best way forward and that no official at the UAW International Union and/or UAW Region 2B would question Holiefield's judgment on this point for fear of his or her own position.

88.     Bressler made the representations described in the preceding paragraph for the purposes of discouraging Plaintiffs and the leadership of UAW Local Union 12 from continuing to resist the proposed structure of Chrysler's takeover of the Wrangler Paint Shop.

89.     As set forth above, in the fall of 2012, Chrysler executives and Holiefield's team from the UAW International Union engaged in closed-door negotiations in Detroit, Michigan,

excluding any of Plaintiffs or members of UAW Local 12, concerning the status of workers at the Wrangler Paint Shop following Chrysler's takeover.

90.      On or about November 14, 2012, Chrysler and the UAW International Union prepared a memorandum titled "Wrangler Paint Shop Understandings," attached hereto as Exhibit 6, purporting to memorialize an agreement between Chrysler and the UAW International Union.

91.      Pursuant to Exhibit 6, Chrysler would "hire" most UAW members working in the Wrangler Paint Shop.  These workers would be stripped of their existing seniority date and arbitrarily assigned an entry date of November 30, 2012, or the date that Chrysler purported to officially take over direct management of the Wrangler Paint Shop.

92.      In most cases, wages of UAW members working in the Wrangler Paint Shop would be frozen, regardless of seniority in the plant.  As a result, these workers would be deprived of periodic raises that they would otherwise have received pursuant to either the existing Local Agreement (Exhibit 4) or starting pay pursuant to the then-prevailing master agreement with Chrysler (Exhibit 1).  In addition, workers remaining in the Wrangler Paint Shop would be deprived of certain pension or other benefits to which they would have otherwise been entitled based on their seniority at that plant.

93.       Pursuant to Exhibit 6, Plaintiffs, individuals who "retired" from Chrysler in order to work at the Wrangler Paint Shop, would be terminated effective November 30, 2012.

94.      Pursuant to Exhibit 6, Plaintiffs would receive a severance payment and would be required to execute a release of potential claims against Chrysler, all UAW entities and Gonzalez.

95.     Exhibit 6 is signed by Holiefield and UAW Region 2B representative Ken Lortz on behalf to the UAW International Union.

96.      Exhibit 6 is initialed by subordinates of Chrysler Vice President of Employee Relations Alphons Iacobelli on behalf of the company.

97.     Holiefield and the Chrysler executives identified in the previous paragraph reached the terms of the agreement memorialized in Exhibit 6.

98.     No member of Holiefield's team from the UAW International Union approached Plaintiffs or the leadership of UAW Local 12 about any concessions, however drastic, which would preserve their jobs in the Wrangler Paint Shop.  Instead, Holiefield and his team simply seemed intent on pushing through an agreement that resulted in Plaintiffs' termination.

99.     On approximately November 18, 2012, the UAW International Union presented a collective bargaining agreement reflecting the substantive terms of Exhibit 6 to the members of UAW Local 12 for ratification.

100.    The November 18 meeting was held less than four days after the agreement reflected in Exhibit 6 was reached and only 12 days before Plaintiffs were to be terminated.

101.    At the November 18 meeting, for the first time, Jim Waingrow presented the proposed agreement on behalf of the UAW International Union to employees of Wrangler Paint Shop.  Waingrow indicated that the proposal was the result of complex negotiations conducted in good faith between Chrysler and the UAW International Union and, in general, "was the best that could be accomplished under difficult circumstances."

102.    Moreover, Waingrow presented the proposed agreement as a take-it-or-leave-it offer.  Waingrow made it clear that the UAW International Union was not willing to engage in further bargaining over the issue.  Waingrow also emphasized the position of the UAW

International Union and Chrysler that, as the result of the years-long course of bargaining between them described above, all UAW members working in the Wrangler Paint Shop were solely employed by Gonzalez, had no particular relationship to Chrysler or the applicable master agreements and, with respect to Chrysler, were functionally equivalent to new hires from the street.

103.    As set forth above, Waingrow's statement regarding the status of UAW members working in the paint shop is neither accurate nor complete.  Both Chrysler and the UAW International Union repeatedly reassured Plaintiffs and the leadership of UAW Local 12 that Plaintiffs would be fairly treated as a result of the unconventional arrangements in the Supplier Park.  Moreover, as set forth above, Chrysler and the UAW International Union had repeatedly negotiated "waivers" of provisions of the relevant master agreements to permit the arrangement.

104.    Waingrow further indicated that, if the UAW members working in the Wrangler Paint Shop failed to approve a bargaining agreement memorializing Exhibit 6 at the November 18 meeting, Chrysler would likely terminate substantially all of these employees in the short term.

105.    As a result, the UAW members affected by Exhibit 6, including Plaintiffs, were given only a matter of hours to consider its terms and a very limited opportunity to ask questions of the UAW International Union officials who negotiated the terms of Exhibit 6.

106.    In short, Waingrow and the UAW International Union deliberately staged the November 18 meeting to exert the maximum pressure on UAW members working in the Wrangler Paint Shop to approve Exhibit 6 with a minimum amount of time for consideration or scrutiny of the negotiations leading to the proposal.

107.    At the November 18 meeting, a majority of UAW members working in the Wrangler Paint Shop approved a bargaining agreement memorializing Exhibit 6.

108.    Upon information and belief, the majority of UAW members working in the Wrangler Paint Shop who voted in favor of approving the proposed agreement at the November 18 meeting were individuals who would retain their positions, or were friends or relatives of individuals who would retain their positions, and voted in favor of the proposed agreement out of fear that they would be terminated in the near term if the proposal was not ratified.

109.    Pursuant to the terms of Exhibit 6, Plaintiffs were terminated on November 30, 2012.

110.    Pursuant to the terms of Exhibit 6, Plaintiffs received a severance payment at approximately three months they were terminated.

111.    In order to receive a severance payment, the UAW International Union and Chrysler required each Plaintiff to execute a release of claims against the UAW, Chrysler and others.

112.    Plaintiffs executed a release.  Each Plaintiff did so upon the representations of the UAW International Union, who were bound by a fiduciary duty of fair representation, that:

a.  The UAW International Union, bound by a fiduciary duty of fair representation, had engaged in good-faith negotiations with Chrysler concerning the status of employees in the Wrangler Paint Shop;

b.  In the judgment of the UAW International Union, the agreement evidenced by Exhibit 6 was "the best that could be accomplished under a difficult circumstance" and was, on balance, in the best interest of the UAW union as a whole, as well as the UAW members working in the Wrangler Paint Shop;

     c.   The UAW International Union would not engage in any further bargaining with Chrysler on Plaintiffs' behalf and Plaintiffs would be laid off anyway, regardless of whether they signed the release; and

     d.   The UAW International Union had the right to bargain with Chrysler, while locking the affected employees and local union out of the bargaining.

113.    Plaintiffs, individually and collectively, attempted to utilize administrative or internal paths to challenge their terminations, including the grievance procedure established by the applicable master and local bargaining agreements between Chrysler and the UAW, as well as an internal appellate procedure established by the UAW International Union Constitution.

114.    Like many grievance procedures established by collective bargaining agreements, both the master and local bargaining agreements involve an escalating series of "steps." Generally, the decision to process grievances at early steps involved UAW stewards working in individual plants and the relevant local union.  As the grievance escalates through the "steps," discretion to process and prosecute any grievance shifts to the UAW International Union.

115.    Pursuant to the applicable master agreements, any decision to process a grievance to an impartial Appeal Board must be made by the UAW International Union.  Any resolution of a grievance prior to this stage requires Chrysler's voluntary agreement.

116.    With respect to Plaintiffs, at the early stages of the grievance process, Chrysler simply denied the claims.

117.    The UAW International Union, which controlled the later stages of the grievance process, refused to process any grievance concerning Plaintiffs' termination once it escalated beyond the early stages of the process where local shop stewards and the local union were responsible for processing grievances.

118.    At the time, the UAW International Union cited the agreement between itself and Chrysler contained in Exhibit 6 as its basis for refusing to process any grievance concerning Plaintiffs' termination.  That is, the UAW International Union purported to exercise its judgment that any such grievance lacked merit because Chrysler's termination of Plaintiffs was consistent with the Exhibit 6.

119.    Jeff Weills and Richard Sheets, who were local officers of the UAW shop committee, prosecuted an internal appeal of, among other issues, Plaintiffs' termination pursuant to procedures established by the UAW International Union Constitution.  This appeal timely advanced through all stages of the UAW appellate process, including the Public Review Board, an internal UAW body formed "for the purpose of insuring a continuation of the high moral and ethical standards in the administrative and operative practices of the International Union and its subordinate bodies, and to further strengthen the democratic processes and appeal procedures within the Union as they affect the rights and privileges of individual members and subordinate bodies."  *See*: UAW International Union Constitution Article 23, § 1.

120.    The UAW International Union rejected Weills' and Sheets' appeal at all stages, choosing to credit the version of events presented by Holiefield's team from the UAW International Union Chrysler Department: generally, that they negotiated in good faith, reached the best possible deal under the circumstances and had the authority to lock the UAW Local 12 out of negotiations.  In general, the UAW International Union, at all levels of the appellate process, deferred to the judgment of Holiefield's team from the UAW International Union Chrysler Department.

121.    During the course of the UAW internal appellate procedure, the officials of the UAW International Union involved in the November 2012 bargaining described above

24

abandoned all pretext that provisions of any bargaining agreement prohibited Plaintiffs from continuing to work in the Wrangler Paint Shop due to their status as Chrysler retirees. Instead, these officials now claimed that they attempted to negotiate for Plaintiffs to remain employed in Wrangler Paint Shop, but Chrysler steadfastly and apparently irrationally refused to continue to employ Plaintiffs under any circumstances.

122. Plaintiffs were unable to obtain any relief concerning their termination, despite exhausting all available remedies available under the applicable collective bargaining agreements and the UAW's internal procedures.

### Federal indictments reveal that UAW International Union executives accepted bribes from Chrysler executives and prospective employees

123. General Holiefield died in March 2015.

124. On July 26, 2017, a federal investigation into the Chrysler Department of the UAW International Union became public knowledge when a felony indictment was unsealed in the Eastern District of Michigan against Alphons Iacobelli and Monica Morgan, as well as criminal charges by information against Jerome Durden.

125. As set forth above, Iacobelli was Chrysler's Vice President of Employee Relations during the fall 2012 negotiations concerning the status of the UAW members in the Wrangler Paint Shop.

126. Morgan was Holiefield's girlfriend, and later wife, prior to Holiefield's death.

127. Durden was an accountant and subordinate of Iacobelli at Chrysler.

128. In general, the July 2017 indictment and surrounding press coverage revealed that Iacobelli diverted millions of dollars from Chrysler from a joint UAW-Chrysler National Training Center to the individual pockets Holiefield, his family and close associates.

129. Many of these funds were diverted though sham businesses operated by Morgan.

130.    Among other things, Iacobelli caused Chrysler to pay for at least $1.2 million of personal travel, designer cloths, furniture and jewelry.  In addition, Iacobelli caused Chrysler funds to be diverted from the National Training Center to pay off Holiefield's and Morgan's $262,219 personal mortgage.

131.    Such payments violate, among other laws, the NLRA at 29 U.S.C. § 186.

132.    As noted above, in 2012, Holiefield was the top UAW International Union official responsible for managing a national collective bargaining relationship with Chrysler involving hundreds of thousands of UAW members.

133.    Similarly, in 2012, Iacobelli was the top-ranking Chrysler executive responsible for bargaining with the UAW.

134.    Iacobelli caused illegal payments of Chrysler funds to be made to Holiefield and other officials of the UAW International Union's Chrysler Department in exchange for company-friendly treatment in collective bargaining negotiations at the expense of UAW members.

135.    As set forth above, Holiefield and his team took control of bargaining concerning the status of the UAW members working in the Wrangler Paint Shop in a manner contrary to the UAW Constitution, and longstanding past practice, by locking the affected employees and UAW Local 12 out of the negotiations.  Having done so, Holiefield and his team negotiated a company friendly agreement at the expense of Plaintiffs.

136.    Press reports immediately following the July 2017 indictments also revealed that members of the UAW International Union's Chrysler Department were under investigation for "selling jobs," or accepting cash payments of a few thousand dollars, from prospective employees for assistance in finding UAW jobs in Chrysler plants.

137.    James Hardy is under investigation for selling jobs at Chrysler plants.

138.    As set forth above, Plaintiffs were replaced by new UAW hires on an almost one-for-one basis following their termination in November 2012.

139.    Despite widespread interest from local Toledo residents, a suspiciously large number of individuals who were hired to replace Plaintiffs relocated from Detroit to accept positions in the Wrangler Paint Shop.  Some such individuals have acknowledged "buying" their jobs.

140.     Thus, Holiefield and his team from the Chrysler Department of the UAW International Union had two separate unlawful motives directly adverse to Plaintiffs at the time that they bargained away Plaintiffs' jobs with Iacobelli and Chrysler.  First, Holiefield and his team had accepted bribes, and hoped to accept additional bribes, from Chrysler to take company-friendly positions at the expense of the UAW members that they represented.  Second, members of the Chrysler Department of the UAW International Union had developed a lucrative side business of selling Chrysler jobs.  By acting in the manner described above, these officials created over 70 open positions that could be sold.

## FIRST CAUSE OF ACTION
### (Violations of the LMRA Against All Defendants)

141.    Plaintiffs repeat and incorporate herein all previously pleaded averments.

142.    Plaintiffs bring their first cause of action against all Defendants pursuant to Section 301 of the LMRA, codified at 29 U.S.C. § 185.

143.    As set forth above, Chrysler terminated Plaintiffs in violation of the applicable master and local bargaining agreements between Chrysler and the UAW.

144.    As set forth herein, Chrysler discriminated against Plaintiffs on the basis of age.

145.     Moreover, as set forth above, Chrysler unlawfully paid bribes to executives of the UAW International Union to take company-friendly positions during collective bargaining negotiations, including those leading to Plaintiffs' termination in November 2012.

146.     Plaintiffs sought to prosecute grievances pursuant to the applicable collective bargaining agreements, but the UAW International Union refused to process their grievances beyond any stage over which it had discretion.

147.     In the alternative, any further attempt to prosecute grievances by Plaintiffs would have been futile under the circumstances described above.

148.     Plaintiffs have exhausted all internal union procedures with respect to their terminations.

149.      In the alternative, any further attempt to utilize internal union procedures by Plaintiffs would have been futile under the circumstances described above.

150.     As set forth above, the UAW International Union acted in an arbitrary, discriminatory and dishonest manner in its duty to represent Plaintiffs in the bargaining process that resulted in their termination in November 2012.

151.     Through its arbitrary, discriminatory and bad-faith conduct, the UAW International Union has breached its duty of fair representation to their members, including Plaintiffs.

152.     Due to the UAW International Union's breach, Plaintiffs have sustained damages. Specifically, Plaintiffs would not have been terminated in violation of the master and local bargaining agreement, or in an unlawful and discriminatory manner, as set forth above.

153.      Plaintiffs bring this hybrid action against Chrysler and the UAW International Union to recover all legal and equitable relief available, including reinstatement, an award of

back pay, an award of front pay, consequential and compensatory damages, punitive damages, costs and reasonable attorney's fees.

154.     Had the UAW International Union appropriately represented Plaintiffs, this action would not be necessary.  Plaintiffs are entitled to recover their costs and reasonable attorneys' fees as an element of actual damages as a result of the UAW International Union's breach.

155.     To the extent that Defendants seek to rely on releases of claims purported executed by Plaintiffs in 2012, such releases are void under the doctrines of fraud, duress, illegality and undue influence.

156.     As described above, Plaintiffs were unable to discover the UAW International Union's breach of its duty of fair representation until the federal investigation became public knowledge in July 2017.  As set forth above, Plaintiffs had no way of knowing that executives in the UAW International Union had accepted bribes to act against their interest until this investigation became public.

<u>**SECOND CAUSE OF ACTION**</u>
<u>**(Age Discrimination Pursuant to O.R.C. § 4112.14 as to Chrysler)**</u>

157.     Plaintiffs repeat and incorporate herein all previously pleaded averments.

158.     As set forth above, Plaintiffs herein are all long-serving employees of Chrysler and members of the UAW.  By 2006, each Plaintiff had accumulated sufficient seniority to participate in Chrysler's unconventional plan to operate the Toledo Supplier Park and "retire" from Chrysler, begin collecting their pension and start working for a nominally independent third-party supplier.

159.     In 2012, each Plaintiff was over the age of forty.

160.     In 2012, each Plaintiff was working in the Wrangler Paint Shop, satisfactorily performing his or her job function and qualified to continue to do so.

161.     In November 2012, each Plaintiff was terminated from his or her employment under the circumstances described above.

162.     At the time that Plaintiffs were terminated, Chrysler systemically retained substantially younger workers hired between 2006 and 2012.

163.     Following Plaintiffs' termination in 2012, Chrysler systematically replaced them with substantially younger workers.

164.     In addition to being manifestly unfair to the Plaintiffs who "retired" from Chrysler in order to work at the Wrangler Paint Shop, the agreement memorialized in Exhibit 6 appears to make little economic sense to Chrysler with respect to Plaintiffs.  If Plaintiffs were permitted to continue to work under the other substantive terms of Exhibit 6, however otherwise unlawful or unfair, their "seniority date" would have been November 30, 2012, and their wages would have been frozen or reduced.

165.     Plaintiffs' nominal reemployment with Chrysler pursuant to the other substantive terms of Exhibit 6, however otherwise unlawful or unfair, would not have resulted in any increase in pension payments to them.  In fact, under the terms of the applicable master pension agreements, pension payments would have been identical, reduced or suspended during a period of reemployment.

166.     Moreover, the termination of Plaintiffs had no appreciable effect on the overall employment in the Wrangler Paint Shop.  As Chrysler intended, Plaintiffs were replaced on a nearly one-for-one basis by UAW members who were "new hires" into the Wrangler Paint Shop.

167.    Chrysler's conduct as described herein constitutes discrimination on the basis of age.

168.    Chrysler lacked any legitimate alternative business reason for not continuing Plaintiffs' employment.  Indeed, according to the UAW International Union, Chrysler simply refused to continue Plaintiffs' employment under any circumstances and at any rate of pay. Instead, Chrysler simply insisted on terminating Plaintiffs due to their status as older retirees.

169.    To the extent that Chrysler seeks to offer an alternative basis for Plaintiffs' termination, such explanation would be mere pretext.

170.    Plaintiffs bring their second claim for relief pursuant to O.R.C. § 4112.14 against Chrysler.  In the alternative, Plaintiffs bring their second claim for relief under any provision of Ohio law prohibiting discrimination on the basis of age.

171.    To the extent that Chrysler seeks to rely on releases of claims purported executed by Plaintiffs in 2012, such releases are void under the doctrines of fraud, duress, illegality and undue influence.

172.    To the extent that Chrysler contends that Plaintiffs have or had available avenues to arbitrate their discharge, such arbitration would be futile due to the UAW International Union's failure to represent them in good faith as described above.

**WHEREFORE,** the individual Plaintiffs named above, demand judgment against Defendants, jointly and severally, in an amount to be determined by a jury and further demand judgment as follows:

A.  For injunctive and declaratory relief ordering their reinstatement;

B. For damages in an amount to be determined by a jury, including back pay, front pay, compensatory damages, punitive damages and whatever additional monetary relief may be available in law and equity;

C. For an award of reasonable attorney's fees, costs and expert witness fees; and

D. For whatever additional legal and equitable relief may be available under the circumstances.

Respectfully submitted,

*/s/ Leslie O. Murray*
Leslie O. Murray (0081496)
Direct Dial: (419) 624-3125
lom@murrayandmurray.com
John T. Murray (008793)
jotm@murrayandmurray.com
Michael J. Stewart (0082257)
stewart@murrayandmurray.com
**MURRAY & MURRAY CO., L.P.A.**
111 East Shoreline Drive
Sandusky, OH 44870
Facsimile: (419) 624-0707

*Attorneys for Plaintiffs*

## JURY DEMAND

Plaintiffs hereby demand trial by jury as to all issues.

*/s/ Leslie O. Murray*
Leslie O. Murray (0081496)
**MURRAY & MURRAY CO., L.P.A.**

*Attorneys for Plaintiffs*